UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

SHANGHAI WHOLESALE, LLC, TRAYLOR ELECTRIC CO., INC., ALEXANDER ELECTRIC, INC., and BERMUDEZ ROOFING COMPANY, LLC,

Plaintiffs,

-v-

MICHAEL VASQUEZ, RIDGE FUNDING NY CORP., IMMENSITY PARTNERS, LLC, and ACME FUNDING NY CORP.,

Defendants.

---------------------------------------- X

26cv199 (DLC)

<u>OPINION AND ORDER</u>

APPEARANCES:

For plaintiffs:

Shane R. Heskin
Heskin & Proper PLLC
641 Lexington Avenue, 14th Floor
New York, New York 10022

For defendants:

Matthew G. DeOreo
Tacopina Seigel & DeOreo
275 Madison Avenue, 35th Floor
New York, New York 10016

DENISE COTE, District Judge:

Defendants Michael Vasquez, Ridge Funding NY Corp. ("Ridge Funding"), Immensity Partners, LLC ("Immensity"), and ACME Funding NY Corp. ("ACME") move to dismiss the second amended complaint ("SAC") pursuant to Rules 12(b)(6) and 12(b)(7), Fed.

R. Civ. P. For the following reasons, the motion is largely denied.

## Background

The following facts are taken from the SAC and the exhibits attached thereto. For the purposes of this motion, the SAC's allegations are taken as true, and all reasonable inferences are drawn in plaintiffs' favor.

I. The Parties and the Alleged Scheme

Plaintiffs are four small businesses located in various states across the country: Shanghai Wholesale, LLC, based in Minnesota; Traylor Electric Co., Inc., based in Florida; Alexander Electric, Inc., based in Texas; and Bermudez Roofing Company, LLC, based in Tennessee. All four plaintiffs are victims of defendant Michael Vasquez's "unlawful loansharking enterprise." Vasquez, who resides in Uniondale, New York, is the managing member of the three entity defendants: Ridge Funding, ACME, and Immensity. Each entity is a New York company with an address in Uniondale.

The SAC alleges that Vasquez, using aliases including "Paul Gibson," "Jeff Goldberg," and "John Clemmens," ran what plaintiffs call a fraudulent "carroting" scheme. According to the SAC, Vasquez contacted businesses that were struggling with existing merchant cash advance ("MCA") obligations and told them

that they had been approved, or would soon be approved, for a large, long-term, low interest "consolidation loan." To qualify for that loan, he told them, they first needed to take out additional short-term MCAs. Plaintiffs allege that the consolidation loans never existed, that the approvals came from fictitious companies, and that Vasquez earned commissions from the MCA funders and fees from the merchants. Some of the MCAs were funded by ACME, Vasquez's own company. Plaintiffs allege that the MCAs carried effective interest rates "far in excess of 100%," some above 2,000%, while the maximum rate permitted under New York criminal usury law is 25%. Each plaintiff's specific allegations are recounted below.

A. Shanghai Wholesale, LLC

Shanghai Wholesale, LLC ("Shanghai") is a Chinese food wholesaler based in Minnesota. It is owned by two Chinese nationals with a limited command of English.

In early 2025, it was experiencing cash-flow problems after relocating its facility. In late 2025, Vasquez, presenting himself as "Paul Gibson" of Ridge Funding, told Shanghai that he could secure a $5 million term loan for the business within about a month. On December 16, 2025, he emailed Shanghai that it had "received approval for a $1,000,000 facility with a 24-month tenor, priced at approximately 1.625% per month." The

email stated that Ridge Funding worked with "millions of clients each month," and its signature block listed offices in New York City, Detroit, Los Angeles, Miami, Toronto, and Montreal. The SAC alleges that these representations were false and were designed to make Ridge Funding appear to be a legitimate, large-scale lender. Vasquez told Shanghai that it first needed to obtain approximately $1 million in short-term funding to establish its credibility for the larger financing. On December 29, he sent Shanghai an approval letter for a $5 million loan at 12% interest.

In reliance on these representations, Shanghai entered into two MCAs with non-party funders. On December 19, it received $474,500 from Itria Ventures in exchange for a contractual collection amount of $650,000. On December 30, it received $379,965 from Lifetime Funding in exchange for a contractual collection amount of $600,000. Shanghai believed at the time that these funders were affiliated with "Mr. Gibson's" organization.

In January 2026, Vasquez began offering Shanghai MCAs from his own company, ACME. He first had Shanghai sign an ACH authorization for a $15,000 "Professional Service Fee," and then debited Shanghai's account four times on January 12 and 13, for

a total of $60,000. Between January 16 and February 17, Shanghai entered into four MCAs with ACME:

| Date | Amount Received | Contractual Collection Amount |
|---|---|---|
| Jan. 16 | $79,950 | $160,000 |
| Jan. 31 | $79,950 | $288,000 |
| Feb. 12 | $105,950 | $400,000 |
| Feb. 17 | $0 | $943,248.60 |

The $5 million loan never materialized. On March 27 and 30, Shanghai emailed Vasquez that it could not survive without the promised loan; Vasquez responded that he would "begin to resolve this issue" and was "working on it." Meanwhile, Shanghai stopped making payments under the MCAs. Lifetime Funding then sued Shanghai in Connecticut for $480,050, and Itria Ventures sent lien letters to Shanghai's credit card processors that froze its ability to process card payments.

On April 29, ACME sued Shanghai in Erie County, New York, for $1,012,470.16. The verification of ACME's complaint was signed by Vasquez. Shanghai is now "on the verge of collapse."

B. Traylor Electric Co., Inc.

In or around March 2025, Vasquez, presenting himself as "Jeff Goldberg" of "Fast Capital," contacted Ron Peters of Traylor Electric Co., Inc. ("Traylor") and told him that he could obtain a long-term, low-interest consolidation loan to pay off Traylor's existing MCA debt. To qualify, Vasquez said,

Traylor needed to take out a series of MCAs to establish a good payment history.

Relying on that representation, Traylor entered into an MCA with non-party G&G Funding Group ("G&G") on April 1, under which it was to receive $1,190,870 in weekly installments over 40 weeks and repay $1,774,397. The SAC describes this as a "reverse consolidation" product. Because Traylor's weekly payments of $54,379.55 soon exceeded the weekly advances that it received, it was, in plaintiffs' words, "effectively paying to borrow its own money." The SAC calculates that, in return for receiving a net $35,810.85 in the first three weeks, Traylor paid $583,527 in interest over 40 weeks, an effective rate of 2,184%. On April 9, Vasquez told Traylor that it had been approved for a consolidation loan from "Peak Management," a fictitious company.

Between May and October 2025, Traylor entered additional MCAs with non-party funders, most of which the SAC alleges Vasquez induced:

| **Date** | **Funder** | **Amount Received** | **Contractual Collection Amount** |
|---|---|---|---|
| May 5 | Kash Advance | $90,000 | $150,000 |
| May 28 | Kash Advance | $62,000 | $225,000 |
| June 9 | Eminent Capital | $54,000 | $89,994 |
| June 20 | Eminent Capital | $68,400 | $209,986 |
| July 8 | Kash Advance | $42,000 | $277,500 |
| July 15 | Litefund Solutions, LLC | $90,000 | $150,000 |
| Aug. 7 | Kash Advance | $151,232 | $375,000 |

| | | | |
|---|---|---|---|
| Oct. 10 | Equita Advance | $90,000 | $149,900 |

In June 2025, Vasquez told Peters that, to qualify for the consolidation loan, Traylor had to wire $150,000 to Immensity to demonstrate its ability to pay. Traylor did so on June 18.[1] Vasquez did not disclose to Peters that he owned Immensity, which Vasquez used "as a vehicle to steal $150,000 from Traylor."

On August 29, Vasquez sent Peters an email purporting to be from "webturbocap" that approved a $1.3 million consolidation loan, payable in weekly installments of $40,625 over 48 weeks, that would pay off Traylor's existing MCAs. As a condition of that approval, Vasquez told Peters that Traylor had to pay off the newer Kash and Eminent MCAs that Vasquez had brokered. Traylor wired $250,000 to Kash and paid off Eminent, but the consolidation loan never closed. Peters, who had spoken with "Jeff Goldberg" of "Fast Capital" dozens of times, realized that he had been defrauded when Vasquez followed up a call with an email using the name "Paul Gibson" of Ridge Funding. Traylor alleges that it paid more than $1,713,275 in usurious interest and fees because of the scheme, while Vasquez earned "hundreds of thousands of dollars in commissions."

[1] The SAC states that the wire was sent on "June 18, 2026," but the surrounding allegations place it in June 2025.

C. Alexander Electric, Inc.

Alexander Electric, Inc. ("Alexander") had existing MCA obligations and was seeking to refinance them. On December 18, 2025, Vasquez, presenting himself as "Paul Gibson" of "Clearwater Management," told Alexander that it had been approved for a $2 million, five-year, low-interest consolidation loan. The SAC alleges that Clearwater Management is a fictitious company. Vasquez told Alexander that the loan was imminent, but that Alexander first needed to take out a short-term loan from non-party Old North Capital to ensure that the consolidation loan would be approved.

Alexander entered into a loan agreement with Old North Capital. The principal amount was $250,000, and the repayment amount was $374,750, payable at $3,122.92 per day. Although Alexander had been told that no fees would be charged, it was charged $25,045 in fees. The SAC alleges that the loan charged an interest rate of 227% on its face. Vasquez also told Alexander that it had to pay off an existing loan from non-party OnDeck Capital to qualify for the consolidation loan, and Alexander did so.

On December 31, Vasquez told Alexander that it was fully approved and in the queue for a funding call. Despite text messages that day confirming that Alexander would be funded,

Vasquez stopped responding, and the $2 million loan was never funded. Alexander alleges that it defaulted on its other MCAs as a result, incurring default fees and penalties, and has had to pay attorney's fees to defend against the Old North loan.

D. Bermudez Roofing Company, LLC

On April 6, 2026, Vasquez cold-called Bermudez Roofing Company, LLC ("Bermudez") and informed the business that it had been preapproved for a long-term loan. He followed up with an email, as "John Clemmens" of "Immense-Funding," offering to approve Bermudez for a term loan of up to $750,000. The email's footer, like Ridge Funding's, listed Immense-Funding offices in New York City, Detroit, Los Angeles, Miami, Toronto, and Montreal. On April 16, Vasquez told Bermudez that it was approved for a $500,000 long-term loan, but to qualify it had to take out a smaller MCA with ACME. He told Bermudez not to worry about the high cost of the MCA because it would be canceled the following week, once the long-term loan was approved.

In reliance on that representation, Bermudez signed an MCA with ACME that provided for an advance of $53,050 and a contractual repayment amount of $87,797.75. On April 21, Bermudez emailed ACME to ask why the funds had not arrived. The long-term loan was never provided.

On May 5, nearly two weeks after the MCA was signed, defendants deposited $31,900 into Bermudez's account. Bermudez immediately called to say that it did not want the money and wished to return it and cancel the contract. Defendants refused and, on May 11, demanded that Bermudez wire $7,500 that day. Bermudez declined to return any money unless defendants agreed to cancel the contract. On May 14, defendants attempted an unauthorized debit of $87,797.75 from Bermudez's account. Bermudez has retained counsel to cancel the contract.

## II. Procedural History

This action was filed on January 9, 2026. After amending the complaint on May 4, plaintiffs filed the SAC on May 18. The SAC asserts four claims against all defendants: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), based on a pattern of wire fraud and the collection of unlawful debt; (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (3) negligence and breach of fiduciary duty; and (4) common-law fraud. Defendants moved to dismiss the SAC on July 10 pursuant to Rules 12(b)(6) and 12(b)(7), Fed. R. Civ. P. The motion became fully submitted on August 20.

## Discussion

I. Rule 12(b)(7)

Defendants seek dismissal of the SAC under Rule 12(b)(7), Fed. R. Civ. P., contending that the non-party signatories to the MCAs are indispensable parties under Rule 19(b), Fed. R. Civ. P.[2] Rule 19 "sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party." Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 724 (2d Cir. 2000). First, the court asks whether an absent party is "required" under Rule 19(a). An absent party is "required," and therefore must be joined, if feasible, where:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). A non-party to a contract whose rights the court must define to resolve a plaintiff's claim is likely a "required" party under Rule 19(a). Jonesfilm v. Lion Gate Int'l, 299 F.3d 134, 141 (2d Cir. 2002). Joint tortfeasors, by

[2] According to defendants, these non-party signatories include G&G Funding Group LLC, Kash Advance, Eminent Capital, Litefund Solutions, LLC, Equita Advance, Old North Capital, OnDeck Capital, Itria Ventures, and Liftetime Funding.

contrast, are generally "permissive parties." Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) (per curiam).

If a required party can be joined, the remedy is joinder, not dismissal. Fed. R. Civ. P. 19(a)(2). Only if a required party cannot be joined does the court consider under Rule 19(b) whether "in equity and good conscience" the action should proceed among the existing parties or be dismissed. Fed. R. Civ. P. 19(b). But where a party does not qualify as necessary under Rule 19(a), "the court need not decide whether its absence warrants dismissal under Rule 19(b)." Kearney, 212 F.3d at 724; see also Jonesfilm, 299 F.3d at 139 ("A party cannot be indispensable unless it is a 'necessary party' under Rule 19(a).").

Defendants' motion to dismiss fails because they do not contend, let alone show, that the non-party funders cannot be joined. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 due to the federal RICO claims, so joining the non-party funders would not destroy subject-matter jurisdiction. Defendants identify no other obstacle to joinder. Thus, even if the non-party funders were required parties, the remedy would be joinder, not dismissal. Fed. R. Civ. P. 19(a)(2).

In any event, defendants have not shown that the non-party funders are required parties under Rule 19(a). Each claim in

the SAC sounds in tort and runs only against defendants; plaintiffs seek no relief against the non-parties nor their MCA agreements.

Defendants contend that each of plaintiffs' claims depends on the MCAs being unlawful and unenforceable, so the non-party signatories' contract rights would be adjudicated in their absence. Not so. The fraud and negligence claims turn on defendants' own conduct, including Vasquez's misrepresentations and the entity defendants' collection of sham fees, for which plaintiffs seek damages from defendants only. The RICO unlawful-debt theory likewise concerns defendants' alleged participation in collecting unlawful debts, including debts owed to non-party funders. Although adjudicating that theory may require determining whether agreements with non-party funders constituted unlawful loans, plaintiffs seek relief against defendants, not the funders. The funders' absence therefore does not prevent the Court from according complete relief among the existing parties. Fed. R. Civ. P. 19(a)(1)(A). Moreover, any determination concerning those agreements would bind only the parties to this action. Their absence therefore does not impair their ability to protect their contractual interests nor expose defendants to a substantial risk of inconsistent

obligations. Fed. R. Civ. P. 19(a)(1)(B). Accordingly, defendants' motion to dismiss under Rule 12(b)(7) is denied.

II. Rule 12(b)(6)

Next, defendants argue that the SAC fails to state a claim for numerous reasons. To defeat a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678). In determining if a claim is sufficiently plausible to withstand dismissal, a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Doe, 100 F.4th at 94 (citation omitted).

A. Counts I and II (RICO and RICO Conspiracy Claims)

The SAC pleads two civil RICO claims: a substantive claim and a conspiracy claim, in violation of 18 U.S.C. §§ 1962(c) and (d) respectively. Section 1962(c) makes it

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To plead a violation of § 1962(c), i.e., a substantive violation of the RICO statute, a civil plaintiff must show that he was injured by the (1) conduct (2) of an enterprise (3) through either: (a) a pattern of racketeering activity or (b) collection of unlawful debt. Kim v. Kimm, 884 F.3d 98, 103 (2d Cir. 2018); see also United States v. Grote, 961 F.3d 105, 119 (2d Cir. 2020) ("RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as on a pattern of racketeering activity."). The collection of unlawful debt does not require that a defendant personally receive payments on the debt. Rather, the defendant must have "aided collection of the debt in some manner." United States v. Moseley, 980 F.3d 9, 18 (2d Cir. 2020) (citation omitted).

Plaintiffs allege that defendants violated RICO through both a pattern of racketeering consisting of wire fraud and the collection of unlawful debt. Defendants raise several challenges to the RICO claim.

1. Distinctness Requirement

First, defendants argue that the enterprise pleaded in plaintiffs' RICO claim does not satisfy the statute's distinctness requirement. When pleading a RICO enterprise, "a plaintiff must 'allege . . . the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name.'" Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013) (citation omitted). In short, "the same entity cannot be both the RICO person and the enterprise." U1it4less, Inc. v. Fedex Corp., 871 F.3d 199, 205 (2d Cir. 2017). A "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3), while an "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4).

The SAC pleads a RICO "enterprise" distinct from the RICO "persons." It describes all defendants as RICO "persons," organized as an "association-in-fact enterprise" engaged in the shared purpose of "deceptive and fraudulent . . . collection of

unlawful merchant cash advances."[3] Although Vasquez is the managing member of all three entity defendants, his control of the entity defendants does not, by itself, defeat distinctness. A natural person is legally distinct from corporate entities that he owns and controls, and there is "nothing in the [RICO] statute that requires more 'separateness' than that." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001).

2. Collection of Unlawful Debt

Next, defendants argue that the entire SAC must be dismissed because plaintiffs fail to plausibly allege that the MCA Agreements are loans rather than purchases of future receivables. Defendants contend that all of plaintiffs' claims depend on allegations of criminal usury and therefore fail absent a plausible allegation that the agreements constitute loans.

The premise of this argument is incorrect. Although a finding that the MCAs are not loans would defeat plaintiffs' usury-based theories, the SAC also alleges misconduct

[3] To prove an "association-in-fact" enterprise, plaintiffs must establish "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). Defendants do not argue that plaintiffs failed to plead an association-in-fact enterprise.

independent of usury.[4] The Court therefore considers defendants' argument as it bears on plaintiffs' RICO theory premised on the collection of unlawful debt only.

Liability for an "unlawful debt" RICO violation requires

> proof that a debt existed, that it was unenforceable under New York's usury laws, that it was incurred in connection with the business of lending money at more than twice the legal rate, that the defendant aided collection of the debt in some manner, and that the defendant acted knowingly, willfully and unlawfully.

United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986).[5] Defendants challenge the second element, arguing that the debts arising from the MCA agreements are not unenforceable under New York's usury laws because the MCA agreements are purchases of future receivables, not loans.

---

[4] For example, the RICO claim rests as well on alleged wire fraud involving false promises of consolidation financing. The negligence and breach of fiduciary duty claims likewise include allegations concerning undisclosed commissions, conflicts of interest, and the knowing inducement of transactions that would trigger defaults under anti-stacking provisions. Finally, the fraud claim alleges false financing approvals and misrepresentations concerning fees. Those theories do not necessarily depend on whether the MCAs are loans, and their sufficiency must therefore be considered separately.

[5] Both parties rely on New York law to determine whether the MCA Agreements constitute loans. The Court therefore applies New York law to that question. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (recognizing that the parties' implied consent is sufficient to establish the applicable law).

Under New York law, "[i]f the transaction is not a loan, 'there can be no usury, however unconscionable the contract may be.'" Seidel v. 18 E. 17th St. Owners, 79 N.Y.2d 735, 744 (1992) (citation omitted). "When determining whether a transaction is a loan, substance -- not form -- controls." Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 334 (2021). A transaction is a loan where the funder is "absolutely entitled to repayment under all circumstances." LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 A.D.3d 664, 665–66 (2d Dep't 2020) (citation omitted). By contrast, a genuine purchase of future receivables places on the purchaser the risk that the merchant will generate fewer receipts than anticipated or cease generating receipts altogether. See id.

In determining whether repayment is absolute or contingent, New York courts generally consider three factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." Id. at 666. A reconciliation provision may indicate that the funder has assumed the risk of declining receipts, but its existence is not dispositive where reconciliation is discretionary or otherwise illusory. See Davis v. Richmond Capital Grp., LLC, 194 A.D.3d 516, 517 (1st Dep't 2021) (describing features of

reconciliation provisions that suggest a transaction may be a loan). For example, "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchased amount" may undercut the funder's full assumption of the risk of declining receipts. Id.

The SAC does not address the three factors directly, and only two MCA agreements are attached to the SAC -- the G&G Funding Agreement with Traylor and the ACME MCA Agreement with Bermudez. Both agreements contain mandatory reconciliation provisions requiring the purchaser to adjust the merchant's payments when the merchant's sales receipts decline and reconciliation is requested. Neither agreement contains a finite repayment term. And neither agreement treats the merchant's bankruptcy as an event of default. These provisions support defendants' characterization of the agreements as purchases of future receivables rather than loans.

Other provisions, however, complicate the allocation of risk. For example, the G&G Agreement permits G&G to continue collecting fixed daily installments while reconciliation is pending. Three rejected ACH withdrawals constitute an event of default, and a default entitles G&G to accelerate the entire unpaid purchased amount. Thus, although the agreement purports

to place the risk of declining revenues on G&G, it is unclear whether Traylor could become liable for the entire purchased amount merely because declining revenues prevented it from meeting the scheduled withdrawals. The agreement's treatment of reconciliation, default, and acceleration therefore does not conclusively establish that G&G assumed the risk of Traylor's business performance in practice.

The ACME agreement presents a similar tension. Its reconciliation provisions require ACME to adjust periodic payments based on actual receipts and permit monthly reconciliation of previously collected amounts, including credits for excess collections. The agreement also lacks a finite repayment term and expressly allocates the risk of ordinary business failure to ACME. Other provisions, however, provide for substantial recourse. Section 15 permits ACME, upon violation of any contractual term or covenant, to increase the specified percentage of receipts to 100% and demand immediate repayment of the entire undelivered purchase amount. The agreement also prohibits the merchant from entering competing MCA arrangements and requires it to represent that the transaction does not conflict with existing obligations. These restrictions are significant considering the SAC's allegations that Vasquez induced merchants already burdened by MCA

obligations to enter additional agreements, potentially triggering contractual defaults from the start that would entitle funders to full payment.

The SAC's description of collection practices further complicates the characterization of the agreements. ACME allegedly sued Shanghai to recover more than $1 million under its MCA Agreements. It also allegedly attempted to debit Bermudez's account for the entire $87,797.75 repayment amount, despite having only advanced $31,900 of the $53,050 owed to Bermudez. The SAC further alleges that non-party funders pursued substantial collection efforts against Shanghai, including litigation and lien notices that froze its ability to process credit-card payments. As a result of those efforts, Shanghai is "on the verge of collapse." Although the enforcement of contractual remedies does not itself establish that an MCA is a loan, these allegations, considered alongside the agreements' broad default and acceleration provisions, support an inference that they are loans.

Taken together, the contractual provisions and the SAC's allegations raise questions concerning whether repayment of the MCAs was genuinely contingent on the merchants' business performance. Defendants' motion to dismiss Count I on the

ground that the MCA agreements are not loans is therefore denied.

3. Pattern of Wire Fraud

Next, defendants mount several challenges to the RICO claim's pattern of wire fraud theory of liability. Each challenge is addressed below.

i. Rule 9(b)

Where, as here, a RICO claim rests on alleged violations of the wire fraud statute, a complaint must satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b) as to those allegations. Lundy v. Catholic Health System of Long Island, Inc., 711 F.3d 106, 119 (2d Cir. 2013). Under Rule 9(b), parties alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requirement is satisfied if the complaint "adequately specif[ies] the statements it claims were false or misleading, give[s] particulars as to the respect in which plaintiff contends the statements were fraudulent, state[s] when and where the statements were made, and identif[ies] those responsible for the statements." Lundy, 711 F.3d at 119 (citation omitted).

Defendants argue that the SAC fails to satisfy Rule 9(b) because it does not identify the dates, speakers, recipients, or

precise contents of the alleged fraudulent statements. The SAC, however, identifies Vasquez as the speaker and describes numerous specific communications through which he allegedly induced plaintiffs to enter MCA agreements by falsely promising long-term consolidation financing. For example, on December 16, Vasquez used the alias "Paul Gibson" of Ridge Funding to notify Shanghai that it had been approved for a $1 million financing facility. He followed up on December 29 with an approval letter for a $5 million loan at 12% interest. The SAC similarly alleges that Vasquez, using the alias "Jeff Goldberg" of "Fast Capital," told Traylor that it had been approved for consolidation financing through a fictitious company, and subsequently sent an email purporting to approve a $1.3 million loan on August 29. As to Alexander, the SAC identifies a December 18 representation that it had been approved for a $2 million consolidation loan through the allegedly fictitious Clearwater Management, followed by December 31 communications confirming that funding was imminent. Finally, Vasquez, using the alias "John Clemmens" of "Immense-Funding," emailed Bermudez on April 6, 2026 about a purported long-term loan and represented on April 16 that Bermudez had been approved for $500,000 in financing.

These allegations identify the speaker, the recipients, the approximate or exact dates, and the substance of the alleged misrepresentations. They also explain why the statements were fraudulent: the promised consolidation loans did not exist or were never funded, the purported approvals came from fictitious companies, and Vasquez used the false promises to induce plaintiffs to enter additional MCA agreements from which he profited. Many of the communications are attached to the SAC. The SAC therefore satisfies Rule 9(b) with respect to the alleged consolidation-loan misrepresentations.

ii. Continuity

Where, as here, a RICO claim is premised on a pattern of racketeering activity, a plaintiff must allege continuity. This requirement does not apply to a RICO claim premised on the collection of unlawful debt, which "may be predicated on a single instance." Grote, 961 F.3d at 119.

Continuity may be established through either a closed-ended or an open-ended pattern of racketeering activity. Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017). Closed-ended continuity is "primarily a temporal concept" and "generally requires that the [predicate] crimes extend over at least two years." Id. (citation omitted). Open-ended continuity, by contrast, exists where the criminal activity "by its nature projects into the

future with a threat of repetition." Id. (citation omitted). Such a threat may be inferred where the enterprise's business is "primarily unlawful" or where "the predicate acts were the regular way of operating that business." Id. (citation omitted).

The alleged wire fraud scheme spans roughly fourteen months, from March 2025 to May 2026. Because this falls short of the Second Circuit's two-year benchmark, closed-ended continuity is not pleaded.

Open-ended continuity, however, is adequately alleged. The SAC describes an enterprise whose alleged purpose was to defraud distressed merchants through false promises of consolidation financing. Vasquez employed substantially the same scheme against four unrelated businesses, using aliases and fictitious lenders to induce them to enter high-cost financing arrangements. These allegations permit an inference that the fraudulent conduct was the enterprise's regular way of operating and that the scheme had no natural end point. Compare Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 185 (2d Cir. 2008) (finding no open-ended continuity where enterprise conducted a "primarily legitimate" business). The SAC therefore adequately alleges open-ended continuity.

iii. Materiality

To establish wire fraud, a plaintiff must allege a scheme to defraud involving a material misrepresentation. United States v. Runner, 143 F.4th 146, 156 n.8 (2d Cir. 2025). A misrepresentation is material if it "would naturally tend to lead or is capable of leading a reasonable person to change his conduct." United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017) (citation omitted).

Vasquez represented to plaintiffs that they had been approved, or would soon be approved, for long-term consolidation loans, but that they first needed to enter into additional short-term MCA agreements to qualify. These representations were plainly capable of influencing plaintiffs' decisions to enter the MCA agreements.

Defendants argue that the alleged misrepresentations were immaterial because they did not concern the economic terms of the MCA agreements. Defendants also argue that merger clauses contained in certain MCA Agreements superseded any prior representations and therefore defeat materiality. The alleged misrepresentations, however, concerned promises of future consolidation financing and were made by Vasquez (using one of his aliases), who was not a party to the MCA agreements. Moreover, "contractual disclaimers" generally "do not render

prior false statements immaterial for purposes of criminal fraud statutes." Id. at 95. The SAC therefore adequately alleges that those misrepresentations were material to plaintiffs' decision to enter the MCA agreements.

iv. Proximate Causation

To establish injury "by reason of" a RICO violation, a plaintiff must demonstrate both that the violation was the but-for cause of his injury and that it was the proximate cause, meaning that "there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 132 (2d Cir. 2010) (citation omitted). Where a RICO claim is premised on wire fraud, a plaintiff need not establish that he personally relied on the alleged misrepresentations. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 642 (2008). Nevertheless, reliance is relevant to establishing causation because, "[i]n most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." Id. at 658.

Defendants argue that plaintiffs cannot establish proximate causation for injuries arising from MCA agreements with non-party funders. According to defendants, the funders' decisions to enter into those agreements were intervening acts that broke

the causal chain between Vasquez's alleged misrepresentations and plaintiffs' injuries. This argument ignores the nature of the alleged scheme. Vasquez's misrepresentations induced plaintiffs to enter the very agreements that caused their alleged injuries. Plaintiffs relied on the promised consolidation financing in taking on additional MCA obligations and consequently incurred substantial fees and repayment obligations. Given the "direct relationship" between plaintiffs' injuries and Vasquez's misrepresentations, proximate causation has been adequately pled.

v. Immensity

A "pattern of racketeering activity" requires at least two predicate acts. 18 U.S.C. § 1961(5). To establish a substantive RICO violation under § 1962(c), the statutory requirements "must be established as to each individual defendant." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). Accordingly, a defendant's liability under § 1962(c) cannot rest solely on the racketeering acts committed by other members of the enterprise. See United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise . . ..").

Defendants argue that the substantive RICO claim against Immensity must be dismissed because the SAC alleges only one predicate act involving Immensity. Although the SAC alleges numerous fraudulent communications by Vasquez, it does not allege facts attributing at least two such acts to Immensity. Accordingly, Count I is dismissed against Immensity insofar as it is premised on a pattern of wire fraud. Defendants do not separately challenge Immensity's liability under the alternative theory of collection of unlawful debt, which does not require a pattern of racketeering activity. That theory of liability as to Immensity may therefore proceed.[6]

vi. RICO Conspiracy

Defendants also seek dismissal of the RICO conspiracy claim on the ground that plaintiffs have failed to plead an underlying RICO violation. Because the SAC adequately pleads a substantive RICO violation, that argument fails.

[6] Unlike a substantive RICO claim premised on a pattern of racketeering activity, a RICO conspiracy claim under § 1962(d) does not require each defendant to commit two predicate acts. United States v. Arrington, 941 F.3d 24, 36 (2d Cir. 2019). But defendants do not separately challenge the sufficiency of the allegations concerning Immensity's agreement to participate in the alleged RICO conspiracy, so the Court does not address that issue.

B. Count III (Negligence and/or Breach of Fiduciary Duty)

Defendants also move for the dismissal of the negligence and breach of fiduciary duty claims alleged in Count III.

1. Negligence

Defendants argue that plaintiffs' negligence claim is barred by New York's economic-loss doctrine because plaintiffs seek recovery solely for financial injuries. But the New York Court of Appeals has ruled that the economic-loss rule "does not have application beyond the products liability context." IKB Int'l, S.A. v. Wells Fargo Bank, N.A., 40 N.Y.3d 277, 290 (2023). Accordingly, defendants have not established that the economic-loss rule warrants dismissal of the negligence claim at issue here.

2. Fiduciary Duty

Defendants also argue that plaintiffs failed to plead a fiduciary relationship. To state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary relationship, misconduct by the defendant, and resulting damages. Schiano v. Harsanyi, 218 N.Y.S.3d 97, 100 (2d Dep't 2024). A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d

11, 19 (2005) (citation omitted). Such a relationship is "grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." Id. Although an ordinary commercial relationship does not itself give rise to fiduciary duties, such duties may arise where the parties establish a relationship of heightened trust through the provision of expert advice. Id. at 20–22.

Defendants argue that the SAC fails to allege a fiduciary relationship because the parties engaged only in arm's-length commercial transactions. The SAC, however, alleges that Vasquez undertook to advise plaintiffs about how to obtain consolidation financing, and recommended additional MCA transactions as necessary steps toward obtaining that financing. The SAC further alleges that Vasquez concealed his financial incentives to recommend higher-cost financing. These allegations support an inference that Vasquez undertook an advisory role. He did so while acting on behalf of Ridge Funding, including his communications with Shanghai under the name "Paul Gibson of Ridge Funding." The SAC therefore adequately alleges a fiduciary relationship involving Vasquez and Ridge Funding.

The allegations against ACME and Immensity are different. Although the SAC alleges that these entities participated in the

financing scheme, it does not allege that either undertook to advise plaintiffs or that Vasquez acted on their behalf when providing the alleged financing advice. Vasquez's management of these entities, without more, does not establish that they owed plaintiffs fiduciary duties. Accordingly, the breach of fiduciary duty claim is dismissed against ACME and Immensity but survives against Vasquez and Ridge Funding.

C. Count IV (Fraud)

To state a claim for fraud under New York law, a plaintiff must allege "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." Connaughton v. Chipotle Mexican Grill, Inc., 29 N.Y.3d 137, 142 (2017) (citation omitted). A fraud claim must also satisfy Rule 9(b), Fed. R. Civ. P., which requires a plaintiff to plead the circumstances constituting fraud with particularity. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).

Defendants argue that the fraud claim fails for the same reasons they contend the RICO wire fraud theory is deficient: lack of materiality, proximate causation, and particularity

under Rule 9(b). Those arguments are rejected for the reasons already stated.

Defendants additionally argue that the fraud claim improperly groups them together without identifying which defendant made each alleged misrepresentation. This argument succeeds only in part. The SAC identifies Vasquez as the speaker responsible for the alleged consolidation-loan misrepresentations, including the dates, recipients, and substance of those statements. Moreover, the SAC alleges that Vasquez made certain representations while purporting to act on behalf of Ridge Funding, including his communications with Shanghai under the name "Paul Gibson of Ridge Funding." These allegations adequately plead fraud against Vasquez and Ridge Funding.

The SAC does not, however, identify fraudulent representations made by ACME or Immensity, nor adequately explain how the alleged consolidation-loan misrepresentations are attributable to them. Nor do the SAC's collective allegations that "Defendants" misrepresented fees and financing terms identify the defendant responsible for each alleged statement. Accordingly, Count IV is dismissed against ACME and Immensity, but survives against Vasquez and Ridge Funding.

D. Leave to Amend

Plaintiffs request that they be granted leave to amend the SAC after "receiving the benefit of the Court's ruling." In general, leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend may be denied, however, "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Miller v. United States ex rel. Miller, 110 F.4th 533, 550 (2d Cir. 2024) (citation omitted). Additionally, leave to amend need not be given if a plaintiff "fails to specify how amendment would cure the pleading deficiencies in its complaint." Id. at 550-51 (citation omitted).

Plaintiffs' request for leave to amend is denied. An Order of July 15, 2026 gave plaintiffs the opportunity to amend their complaint for a third time in response to defendants' motion to dismiss and cautioned that they were unlikely to have a further opportunity to amend. Plaintiffs chose not to amend the SAC, and to oppose the motion instead. That opposition was largely successful in defeating defendants' motion. Moreover, plaintiffs have not identified additional facts that would cure the deficiencies found in the SAC.

## Conclusion

Defendants' July 10, 2026 motion is granted as to (1) Count I against Immensity insofar as it is premised on a pattern of wire fraud; (2) Count III against ACME and Immensity insofar as it alleges breach of fiduciary duty; and (3) Count IV against ACME and Immensity. The motion is otherwise denied. Plaintiffs' request for leave to amend is denied.

Dated: New York, New York
November 13, 2026

DENISE COTE
United States District Judge